IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH AHEADOFFV@GMAIL.COM THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 5:21-mj-5284-MAS<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Theodore Jones, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Google LLC and ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California. The information to be searched is found on the Google account associated with aheadoffv@gmail.com, further described in the following paragraphs and in Attachment A (the "Target Account"). This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been since May 13, 2018. I am currently assigned to the Louisville Division's cyber squad. As an SA of the FBI, I am authorized to investigate crimes involving violations of federal law, including computer crimes, and I have received training in general law enforcement, cyber investigations, and digital forensics, to include multiple professional certifications pertaining to cybersecurity. I have conducted numerous investigations involving computer intrusions and cryptocurrencies. Prior to the FBI, I was employed by the Gainesville, Florida Police Department for five years as an Officer, where I was authorized to investigate criminal violations of Florida state law. I also hold a juris doctor from Florida International University College of Law.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 (fraud by wire, radio, or television), 18 U.S.C. § 1349 (attempt and conspiracy), 18 U.S.C. § 1030 (unauthorized access of a protected computer), and 18 U.S.C. § 371 (conspiracy) have been committed. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

**JURISDICTION**

5.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

6.  In February 2020, members of the University of Kentucky (UK) administration and cybersecurity team discovered a breach to their computer network. UK contracted with Microsoft and CrowdStrike, a private cybersecurity firm, to conduct a forensic investigation into the breach. Their private investigation determined that on or about January 3, and January 6, 2020, unknown perpetrator(s) attempted to infiltrate the computer network of UK HealthCare, a major public hospital in Kentucky, but were unsuccessful.  On or about January 13, 2020, the perpetrator(s) managed to successfully infiltrate UK HealthCare's computer network.  Once inside the network, the perpetrator(s) obtained administrative credentials to access over 9,000 computers throughout the hospital network.  Additional analysis of the intrusion revealed that the perpetrator(s) installed cryptocurrency mining software on the infected network devices and used their computing power to mine for Monero, a form of cryptocurrency.[1] On or

---

[1] Monero (XMR) is a decentralized cryptocurrency, similar to bitcoin, that uses a publicly distributed ledger. Monero though has enhanced privacy that obfuscates transactions to achieve anonymity and fungibility. Observers of the ledger cannot decipher addresses trading Monero, transaction amounts, address balances, or transaction histories. This feature has made Monero popular in darknet markets and for laundering money.

about February 12, 2020, UK's cybersecurity team, along with Microsoft and CrowdStrike, were able to remove the perpetrator(s) from the network.

7. The investigation team was not able to locate any evidence of data being exfiltrated from UK's network, however, mining for cryptocurrency is an exhaustive process that is both energy and bandwidth intensive. This process, operating across approximately 9,000 machines, diverted significant amounts of energy and computing power away from UK HealthCare's network that would have otherwise facilitated critical hospital processes and infrastructure.

8. Through the investigation, the FBI identified numerous IP addresses that communicated with the public hospital's network for the purpose of mining Monero. Whois searches resolved these IP addresses to internet service providers (ISPs) with infrastructure located in several countries, to include the United States, Canada, the Netherlands, and China.

9. Two IP addresses that communicated with UK HealthCare's network for purposes of mining cryptocurrency were 139.99.156.30 and 144.217.14.109, which resolved to OVH Hosting, an ISP located in Canada. The FBI obtained subscriber information for the user of these IP addresses pursuant to a mutual legal assistance treaty (MLAT) request to Canadian authorities. The registered user of those two IP addresses at the time of the network intrusion was determined to be Aleksandr Barkovskii, who used email address aheadoffv@gmail.com. Subscriber information also showed Barkovskii resided in Russia. Another IP address that was associated with mining activity on UK

HealthCare's network was 45.76.65.223, which resolved to a U.S. based ISP, Vultr. A subpoena return from Vultr revealed Barkovskii as the registered user of that IP address during the time of the intrusion. His registered email address was aheadoffv@gmail.com. Vultr records also showed Barkovskii resided in Russia.

10. I know, based on reviewing previous legal process returns in this course of this and other investigations, that ISPs such as OVH Hosting and Vultr, often communicate with their customers through their registered email address, covering subjects such as account initiation, account maintenance, and account updates.

11. Records provided by Vultr contained communications between their customer support team and Barkovskii and revealed he was an operator of the website Nanopool.org[2], which offers a public mining pool service to users all over the world.[3] Additional communications revealed Vultr had flagged IP addresses registered to Barkovskii on several occasions due to network traffic being consistent with a denial-of-service (DoS)[4] attack. One such communication was on January 4, 2020.

---

[2] The registrar for Nanopool.org was Domain.com LLC, a company based in the United States. According to a whois lookup, it appears the registrant of Nanopool.org purchased domain privacy services to obfuscate their information.

[3] A mining pool is the pooling of resources by cryptocurrency miners, who share their processing power over a network, to split the reward equally. The process of mining cryptocurrency is energy and bandwidth intensive and is rarely profitable when done on an individual basis. A mining pool allows miners to share a net profit.

[4] A denial-of-service (DoS) attack is a cyber-attack in which the perpetrator seeks to make a machine or network resource unavailable to its intended users by temporarily or indefinitely disrupting services of a host connected to the internet.

12. The investigation has linked two additional complaints from victim organizations to Barkovskii, one on October 11, 2018 and another on September 24, 2020. These victim organizations reported network intrusions that resulted in cryptocurrency mining software being installed on numerous devices. The October 2018 complaint described the malware used to surreptitiously install mining software and stated that "once started, this sample would connect to a mining pool at xmr-eu1.nanopool.org and begin to use almost 100% of the computer's CPU [central processing unit]." Both victims reported their networks had connected to IP addresses owned by Vultr, which were then determined to be registered to Barkovskii.

13. Barkovskii openly represented himself to Vultr as an operator of nanopool.org and referenced reprimanding a user who violated its terms of service. Because Barkovskii used the target email address for official business in communicating with Vultr, there is probable cause to believe that Barkovskii communicated over email with customers for administrative purposes, such as notifying users of actions taken against their account for violating terms of service.

14. Barkovskii is also believed to be a former customer of BTC-e, an online currency exchange that existed between approximately 2011 and July 25, 2017. The FBI's investigation into BTC-e revealed its services were used to facilitate crimes such as computer hacking, fraud, identity theft, tax refund fraud schemes, public corruption, and drug trafficking. A review of financial transactions processed by BTC-e identified movement of criminal proceeds from numerous computer intrusion incidents and

ransomware schemes. On July 25, 2017, the FBI physically seized servers controlled by BTC-e, and FBI digital forensics experts captured forensic images of those servers for analysis. From those servers, FBI forensic experts recovered a SQL database referencing the email address, "aheadoffv@gmail.com" from one of the seized BTC-e servers using reliable forensic techniques. What's more, I am familiar with the operations of BTC-e and know that BTC-e communicated with its users through its registered email account.

15. A search of the Target Account is necessary to identify any customers of nanopool.org, who were associated with the intrusion into UK HealthCare's network, and to determine the degree to which Barkovskii is aware of Nanopool.org facilitating criminal activities. Further, location information for the Target Account is necessary if, as suggested by the records described above, Barkovskii and his coconspirators are located in Russia, which will affect how the investigative team approaches the next steps of this investigation. In his communications with Vultr, Barkovskii has stated numerous times, "We do not allow any abusing, but we are providing a public service and it is technically very difficult or even not possible sometimes to detect the abuse at the pool side."

16. Browsing history for the Target Account is also necessary because it can connect the subject to the victim. In my training and experience, cyber criminals, especially those located abroad but targeting victims in the United States, are likely to research a victim organization using publicly available resources on the internet to gain pertinent information that can be exploited during an intrusion. Such information would include IP addresses that are assigned to the victim organization, structure of the

organization, and names and titles of employees. Cyber criminals can use this information to identify potential victims and create a plan of attack. Additionally, many hacking tools used by cyber criminals are publicly advertised on forums on the internet. If Barkovskii researched or downloaded hacking tools from the internet using the Target Account, this would be reflected in their browsing history. Browser history can also show online forums and communities Barkovskii has visited and used to communicate with coconspirators.

17. Despite having acknowledged reprimanding a user, it is reasonable to believe nanopool.org may operate as a "bulletproof hosting" [5] service that allows users to obfuscate their identities and operate in anonymity. In my training and experience, it is reasonable to believe Barkovskii used numerous services associated with his Google account operate nanopool.org.

18. A preservation request was submitted to Google for aheadoffv@gmail.com on June 23, 2021 (Google reference number: 6082239).

---

[5] Bulletproof hosting is similar to regular web hosting, but unlike legitimate web hosting services, bulletproof hosting services offer customers considerable leniency in the kinds of activities they can engage in without getting taken down as a result of complaints and abuse reports. Popular amongst all types of cyber criminals, bulletproof hosting providers tend to either completely ignore abuse reports and complaints, or do not handle them properly.

## BACKGROUND CONCERNING GOOGLE[6]

19.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

20.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

21.     Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

---

[6] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

22. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

23. Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

24. Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book, as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

25. Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

26. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

27. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name,

telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

28. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

29. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

30. My Activity also collects and retains data about searches that users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including voice queries made to the Google artificial intelligence-

powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated with a Google Account when the user is logged into their Google Account on the browser or device and certain global settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts in to automatic deletion of their location history every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

31. Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device

13

and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

32. Google Accounts can buy electronic media, like books, movies, and music, and mobile applications from the Google Play Store. Google Play records can include records of whether a particular application has been or is currently installed on a device. Users cannot delete records of Google Play transactions without deleting their entire Google Account.

33. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may

establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. It is reasonable to believe such information could reveal presently unknown subjects.

34. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

35. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the

geographic and chronological context of access, use, and events relating to the crime under investigation.

36.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

37.     Other information connected to the use of a Google account may lead to the discovery of additional evidence.  For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. Such information could include mobile applications for banks or cryptocurrency exchanges that were used to manage funds associated with nanopool.org.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation. Location history can reveal where a subject resides and if it is consistent with previously obtained information. Location history can also show places a subject frequently travels to. When a subject is believed to reside outside the United States, location information is vital so 1) the FBI can determine what country has jurisdiction over the subject, and 2) whether that country's authorities will cooperate with the FBI's investigation.

38. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

39. Based on the forgoing, I request that the Court issue the proposed search warrant.

40. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

41. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity

to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

**Signed remotely per FRCP 4.1.**
Theodore D. Jones
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on ____August 31st_____, 2021.

_____
Honorable Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE